UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

UNITED STATES OF AMERICA,
          *Plaintiff,*
    v.

1:21-CR-0753 (AJN)

ANDREW WARREN,
          *Defendant.*

-------------------------------------------------------x

## MOTION FOR EARLY TERMINATION
## OF SUPERVISED RELEASE [18 U.S.C. §3583(e)(1)]

**NOW COMES** ANDREW WARREN, motioning this Court *in propria persona* (*pro se*) to terminate the imposed term of supervised release, reducing such to a "time already served" duration. This request is made pursuant to title 18 United States Code §3583(e) and Federal Rules of Criminal Procedure 32.1(c).

    Under the same rule of criminal procedure, no hearing is requested in this matter. As I am not an attorney, nor admitted to the federal bar in this district, the instant request is not being made through letter-motion, but through standard motion format. Accompanying this motion is a brief in support which complies with local rules of content, formatting, and length.

## BRIEF IN SUPPORT

### I. ARGUMENT SUMMARY

For my entire professional career, I worked in operations for the United States Intelligence Community, first starting at the National Security Agency in 1996 and then transferring over to the Central Intelligence Agency in 1997. After serving overseas, working with the FBI's Joint Terrorists Task Force (receiving an attached award), two combat tours with U.S. Special Forces in Afghanistan in 2002 and Iraq in 2003, and several overseas assignments abroad, I was assigned as the CIA's Station Chief in Algiers, Algeria in 2007.

In 2008, I was called home to Washington D.C. as an investigation into sexual misconduct had been opened regarding two individuals (identified on the record as "Person A" and "Person B"). See Exhibit 1 (Gov. Sent. Memo. – D.C. Docket Entry 68). In December of 2008, I was relieved as the CIA station chief in Algiers and remained in the U.S. where I lived in a hotel for eight months.

During those months I spiraled into addiction, self-medicating my Post-Traumatic Stress Disorder (PTSD) with whatever stimulant narcotics I could obtain. Hon. Judge Huvelle sentenced me to five years and five months in prison followed by a decade of supervised release in March of 2011. See Exhibit 2 (Judgment Order).

I have now served eight of those ten years of probation. In that time, I have cleaned myself up, cleaned my life up, given the mess I created of it between 2009-2010. In these last 8 years, I have donated and volunteered thousands of hours in the ministry. And in the last year, I have also donated hundreds of hours as a New York State Certified

Addiction Recovery Coach helping people in the grip of addiction. I have also spent the better part of two years working on my recovery, living at the Samaritan Daytop Village Veterans Program in NYC.

I have finished all treatment courses required, and many more beyond those required by the local U.S. Probation Office ("USPO"). The USPO, and my supervising officer, have indicated that this motion will get their support and that this Court will get a recommendation for early termination. For these reasons, and for those that follow, early termination is warranted by my conduct and serves the interests of justice.

## II.     CASE FILINGS AND PROCEDURAL NOTES

The initial indictment filed against me included a single count of Sexual Abuse under 18 U.S.C. §2242(2).[1] For failing to appear for a status conference, a bench warrant was issued for my arrest, and law enforcement descended on my hotel room – en force – because of the training I had in my background from work.

I was arrested pursuant to this bench warrant in April of 2010. At the time of arrest, found to be high from using cocaine base ("crack cocaine"), and in possession of a 9mm Glock pistol that was not my service-issue weapon. My pretrial release was revoked on May 4, 2010 and a new, superseding indictment was filed a month later adding two charged counts of firearms possession.

A second superseding indictment was filed a day later, removing one of the firearms charges and a plea agreement was reached between my counsel and the

---

1  Within the special maritime and territorial jurisdiction of the United States per 18 U.S.C. §7(9)

government. I pleaded guilty before Judge Huvelle on June 7, 2010. That plea agreement stipulated and agreed-upon sentence recommendation of thirty-three (33) months in prison followed by ten (10) years of supervised release. However, nine months later (in March of 2011), Judge Huvelle disregarded that agreement and sentenced me to serve double the stipulated incarceration term: sixty-five (65) months. The supervised release term imposed reflected the ten (10) years stipulated in the plea agreement.

I applied for early termination of supervised release once before, in 2017 when I had served only two years of my supervision period. At that time, my case was still heard by the District of D.C. and Judge Huvelle denied that request, in part, because she did not come to a conclusion on the Court's authority to terminate a term mandated by statute before that mandatory minimum time had elapsed. In December of 2021, a jurisdictional transfer of my case was initiated, and was finalized on December 14, 2021. Docs. 1-3.

### III. THIS COURT HAS THE AUTHORITY TO TERMINATE SUPERVISED RELEASE IN MY CASE

Original jurisdiction over this case rested in the District of D.C. pursuant to 18 U.S.C. §3231. That jurisdiction was transferred to this district in 2021. ECF No. 1.

> "A court to which jurisdiction is transferred under this section is authorized to exercise all powers over the probationer or releasee that are permitted by this subchapter or subchapter B or D of chapter 227." 18 U.S.C. §3605.

This Court is given the statutory authority to grant early termination to supervised release sentences by 18 U.S.C. §3583(e)(1). The Court may:

> [A]fter considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7) –

Page 4

> (1) terminate a term of supervised release and discharge the defendant released at any time after the expiration of one year of supervised release, pursuant to the provisions of the Federal Rules of Criminal Procedure relating to the modification of probation, if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice.

The district court my exercise its discretionary authority under this statute,

> "...[when] a defendant has served at least one year of his supervised release and his conduct and the interests of justice so require, the court may terminate the remainder of the defendant's supervision." *United Sates v. Lussier,* 104 F.3d 32, 36 (2nd Cir. 1997)(quoting *United States v. Truss,* 4 F.3d 437 (6th Cir. 1993).

The Court may even grant this relief when a defendant, serving a term of supervision mandated by statute, has not yet served that mandated minimum amount of time on supervision. *United States v. Vargas,* 564 F.3d 618 (2nd Cir. 2009).[2] Thus, this Court has jurisdictional authority, statutory authority, and discretion to grant this request so long as I have completed one year of supervised release, and such order promotes the interests of justice and is warranted by my conduct.

## IV. <u>PRECEDENT SUPPORTS EARLY TERMINATION IN MY CASE</u>

Modifications of supervision conditions and terms are considered post-sentencing modifications, and not full re-sentencing proceedings, so the Court retains the authority to terminate a term of supervised release even if that term was originally given as a statutory

---

2  *Gozlon-Peretz v. United States,* 498 U.S. 395 (1991) ("[assuming] when Congress adopted the ADAA and used the term `supervised release' it knew of the full definition in the existing Sentencing Reform Act and legislated with reference to it."); *United States v. Spinelle,* 41 F.3d 1056, 1060 (6th Cir. 1994) ("In the mind of Congress...the sentencing phase is different than post-sentence modification... The government, however, again confuses sentencing with post-sentence modification. The district court did not 'resentence' Spinelle, the district court simply 'modified' Spinelle's original sentence...")

Page 5

minimum term. See *United States v. Vargas*, 564 F.3d 618, 623 n.3 (2nd Cir. 2009) (assuming without deciding that a term of supervised release may be ended after one year) (Citing *United States v. Johnson*, 529 U.S. 53, 60 (2000) and *Spinelle, supra*).[3]

District and appellate courts around the country misinterpreted *Lussier* for many years, considering that case as establishing a standard where only cases involving changed or exceptional circumstances would warrant early termination. took the false-standard set by that case even further. For example, early termination was primarily considered a "rarely granted"[4] remedy, and merely "unblemished post-incarceration conduct" or simple "compliance with the terms of supervised release,"[5] are expected of defendants and not good enough to warrant early termination.

So many courts in and out of this Circuit construed *Lussier* this way that the appellate court felt compelled to retract that decision in 2016, clarifying *Lussier* listed only one possible reason (among many) to justify a modification of supervised release conditions. See *United States v. Parisi*, 821 F.3d 343, 347 (2nd Cir. 2016). The *Lussier* Court never intended to create any standard by which district courts could rely (and build) upon for denying early termination requests. Courts locally started adjusting §3583(e) analyses shortly afterward:

---

[3] See also *United States v. Coleman*, No 16-10370 (5th Cir. 2017), *Pope v. Perdue*, 889 F.3d 410 (7th Cir. 2018), and *United States v. Carpenter*, 803 F.3d 1224, 1229, 1241 n.4 (11th Cir. 2015). *Coleman* cites a D.C. Circuit opinion as finding the opposite. See *United States v. Lafayette*, 585 F.3d 435, 440 (D.C. Cir. 2009). However, *Lafayette* addressed only §3583(c)(2) reductions in prison sentences, and did not address post-incarceration modifications.

[4] *United States v. Emmett*, 749 F. 3d 817, 824 (9th Cir. 2014).

[5] *United States v. Medina.* 17 F. Supp. 2d 245, 247 (S.D.N.Y. 1998), *United States v. McKay*, 352 F.Supp.2d 359, 361 (E.D.N.Y. 2005).

> "The appellate court's examples of grounds that may warrant early termination — 'changed circumstances' and 'exceptionally good behavior' — are not a limit on a district court's statutorily granted authority to terminate 'if it is satisfied that such action is [1] warranted by the conduct of the defendant released and [2] the interest of justice." *United States v. Trotter*, 321 F.Supp.3d 337 (E.D.N.Y.. 2018).

The Third Circuit published a mirroring opinion four years later in *United States v. Melvin*. 978 F. 3d 49 (3rd Cir. 2020). Another appellate court to base the standard for early termination on *Lussier* was the Ninth Circuit. See United *States v. Smith,* 219 F.App'x 666, 667 (9th Cir. 2007). That Court did not reverse its reliance on the *Lussier* 'standard' until last year, a quarter-century after *Lussier* was published.

> "In *Smith,* we affirmed the denial of an unopposed motion for early termination of supervised release in an unpublished disposition. *Smith* incorrectly attributed to the Second Circuit's decision in *United States v. Lussier,* 104 F.3d 32, 36 (2nd Cir. 1997), the proposition that early termination is 'reserved for rare cases of `exceptionally good behavior.' In fact, *Lussier* did not interpret § 3583(e) to necessarily require a showing of exceptional behavior for early termination of supervised release." *United States v. Ponce*, 22 F.4th 1045, 1046 (9th Cir. 2022).

The only proper standard a court may use to decide a request for early termination is the standard set by statute. The conduct of a defendant which warrants early termination is a discretionary inquiry that is not constrained by these standards, but considers a wide variety of actions/conduct on the part of the defendant.

## V. <u>SENTENCING FACTORS SUPPORT EARLY TERMINATION</u>

The appropriate standard of review from §3583(e) requires the Court to consider the interests of justice, as informed by the eight sentencing factors it references. To determine whether the defendant's conduct warrants early termination, the second part of the test, is

Page 7

aided primarily by factor §3553(a)(5), which looks at relevant and current policies on this subject. Those policies evolve over time, giving this sentencing factor needed flexibility.

### §3553(a)(1): The Nature and Circumstances of my Offense; my History and Character

My personal history is well documented in the District of D.C docket. I completed my undergraduate degree in 1993 at Norfolk State University with a Bachelor of Arts in History. My Master's Degree in Near Languages and Cultures was completed at Indiana University in 1995. After earning both degrees, I began my intelligence career as an Arabic Linguist at NSA HQ (Fort Meade). I then transferred to Langley with Central Intelligence, then to Kuwait City (1999 – 2001) before embedding with Army Special Forces ahead of the imminent operations in Afghanistan and Iraq.[6] Before and after these combat tours, I served as a Senior Operations Officer with the FBI/NYPD Joint Terrorism Task Force before my promotion to Chief of Operations in Cairo.

Since my conviction and release from prison, I have spent most of the last eight years volunteering: 1) working as a minister at IMC of Harlem, Samaritan Outreach Ministries, and Church of the Covenant here in NYC. 2) certifying with New York State as a Certified Recovery Peer Advocate (CRPA), Certified Addictions Recovery Coach (CARC) and as a Veterans Supported Recovery Professional (VSR).

### §3553(a)(2)(B) – (C): Deterrence; Protecting the Public

Two of these three factors address the same issue: do I pose a heightened threat or risk of re-offending? I have spent eight years working on myself, my sobriety, my integrity, and

---

6   Operations Enduring Freedom ("OEF") and Iraqi Freedom ("OIF").

devoting my time in assistance to others. Sobriety is vital to maintaining a fully self-managed, lawful life. I've given all the time and energy I could possibly give for a vast majority of the prior decade to my recovery from PTSD and addiction, and in the service of others who are grappling with similar demons.

Inextricable from those efforts is a drastic reduction in the risk I pose of future arrest or being convicted of another crime. I am fully committed to never again being subject to prison, where my background puts a target on my back for any and all "tough guys" to try their luck with a trained former-intelligence-operative.

The Court need not take my word for this conclusion, though, as the data available from many sources substantiates this conclusion. For example, the affects of completing substance abuse treatment, especially treatment using the Cognitive Behavioral Therapy modality, has been studied extensively by the U.S. Government in defense of the popular RDAP program. Generally, completing treatment like this reduces a released offender's recidivism risk by an average of 18%.[7]

Recent data published by the Sentencing Commission, regarding recidivism specifically for federal offenders, sheds new light on how different factors affect recidivism risk when analyzed together. For example, the average rearrest rate for male, federal offenders released in 2010 was 52.3%.[8] Using this as a baseline highlights the importance of each offender's characteristics, a focus of the previous sentencing factor.

---

[7] *TRIAD Drug Treatment Evaluation Project Final Report of Three-Year Outcomes: Part I*; Federal Bureau of Prisons Office of Research and Evaluation (2000). See Table 3. "Inmates who completed residential drug abuse treatment were 18 percent less likely to recidivate in the first six months following release than those who did not receive treatment."

[8] *Recidivism of Federal Offenders Released in 2010*; (2021) U.S.S.C. at pg. 31, Table 5.

Page 9

Offenders like me are drastically less likely to reoffend than this average. Released offenders over 50, sentenced in Criminal History Category I, are rearrested 71% less often than the average. When these Criminal History Category I offenders had no previous engagement with the criminal justice system, rearrest rates dropped another 30% beyond those already minimal rates.[9] Further, education by itself factors heavily in recidivism risk: college graduates in the study were rearrested 62% less frequently than average. *Id.*

For sexual offenders in particular, the long-standing "common knowledge" was that sexually oriented offenders were compulsively criminal and re-offended with alarming frequency. It was even considered *stare decisis* as the Supreme Court opined in 2003 about recidivism rates for sexual offenders, labeling it "frightening and high."[10] In the 20 years since, all peer-reviewed studies have found the opposite to be true.[11]

For example, A 2010 study published by the Maine Statistical Analysis Center, (USM Muskie School of Public Service), found released male offenders in Maine were re-convicted of a new sex offense at 3.8% over three years.[12] Later, a 2014 meta-analysis study looking at all sexual offenses sub-types found overall recidivism rates of 6%.[13]

"Critics also question the basic empirical underpinnings of [sex offender

---

9 *Id.* at page 28, Figure 15, and page 30, Table 4. 52.3% average rearrest rates compared to 15% (CHCI & over 50 years old), and 9.3% (CHCI, over 50, with no prior CJ contact).

10 See *Smith v. Doe*, 538 U.S. 84, 103 (2003) and *McKune v. Lile* 536 U.S. 24, 34 (2002)

11 Ira M. Ellman & Tara Ellman, *"Frightening and High": The Supreme Court's Crucial Mistake about Sex Crime Statistics,* 30 Const. Comment. 495 (2015). Referencing *Smith v. Doe,* 538 U.S. 84 (2003).

12 Rubin and Etheridge; *Sexual Assault Trends & Sex Offender Recidivism in Maine*; 2010 Male Offenders released from prison between 2004 and 2008 (N=552). Main Statistical Analysis Center.

13 Rettenberger, Briken and Eher; *Sexual Offender Recidivism Among a Population-Based Prison Sample;* 2014 (International Journal of Offender Therapy and Comparative Criminology.

Page 10

registries], noting that contrary to the understanding of legislatures and courts (including the U.S. Supreme Court)[14] sex offenders do not recidivate at higher rates than offender subgroups."[15]

Now that I have completed work on my addiction issues, leagues beyond the effort required of my by the USPO, the data is clear: the risk I pose as a 55-year-old, first-time offender, with a Master's degree, a sexual offense, and no prior contact with criminal justice is so low as to be nearly nominal with the general population.

### §3553(a)(2)(D) – Correctional Treatment

As stated above, I spent the most of my supervised release term voluntarily in both outpatient and in-residence substance abuse treatment program for veterans and a therapeutic community. I completed a six-month outpatient program after relapsing in 2015. I continued to care for substance use disorder and combat related PTSD through weekly therapy sessions until COVID-19 hit New York City in March 2020.

After COVID-19 caused the city to shut down, my support network ceased. I could no longer participate in face-to-face therapy sessions, nor could I attend the gym regularly, volunteer weekly, or do anything social in the city. It was during this time that my PTSD symptoms came raging back. After nearly 5 years of sobriety, I relapsed just like many other people during COVID-19. After informing my therapist and probation officer of this, it was decided that I would participate in a 90-day program at the Ed Thompson Veterans Center (ETVC). The veteran's program was chosen because of my two combat tours with U.S. Special Forces in Afghanistan and Iraq.

---

14 *Ante*, note 5.
15 Wayne Logan, *Reforming Registries*, Academy for Justice, *A Report on Scholarship and Criminal Justice Reform* (2017).

After 82 days, and my exit from this program neared, I relapsed. Directly following this, I was arguably at the lowest point in my life and I knew I needed to take drastic action. I immediately re-entered treatment and was totally honest with myself and my therapeutic team. I doubled-down with my psychologist from NYU Military Families Center, holding two sessions a week for 6 months and weekly sessions with my other therapist. I got an AA sponsor and began attending every 12-step meeting I could. I decided to remain in the therapeutic rehab center, voluntarily, for another 19 months.

My Psychiatric treatment ended in Dec 2021. See attached completion letter dated 12/08/21 from Dr. Collin Reiff: Medical Director of the Military Family Center. After concluding treatment with the Military Family Center, I began weekly therapy sessions with Mark Gagnon from Headstrong, a mental health treatment practice (See Attachment 2) as well as weekly therapy with my long-term therapist Michael Ham). See Attachment 3. It took 22 months to complete the therapeutic program at Ed Thompson Veteran's Center, and I did so on January 30, 2023. See Attachment 4 (Letter from the clinical director at ETVC).

During those 22 months at ETVC, I took many classes on addiction, triggers, coping skills, relapse prevention, wellness and recovery. Additionally, I took classes for recovery coaching and peer advocacy. I began an unpaid internship in February 2022 at Samaritan Daytop Village Peer Alliance Recovery Center (PARC), assisting clients with their addiction recovery and other challenges. I completed a 500-hour internship in June 2022 at PARC and passed the New York State Certified Recovery Peer Advocate exam.

I am currently a New York State Certified Recovery Peer Advocate (CRPA),

Certified Addictions Recovery Coach (CARC) and a Veterans Supported Recovery Professional (VSR). I continue to volunteer as an unpaid worker for 24 hours each week at PARC since July 2022, helping veterans and civilians alike. See Attachment 5. Now that I have – very recently – completed those 22 voluntary months in-residence at Samaritan Village, I returned to my home. There is no further correctional treatment needs in my case left to be addressed. Since my release from prison I have:

- Certified by New York State as a Certified Peer Recovery Advocate, Certified Addictions Recovery Coach, and Certified Veterans Recovery Support Professional (currently the only one in Samaritan Daytop Village)
- Ordained as a Christian Minister, and
- Been licensed as a Clergy Member and Marriage Officiant by the States of Virginia & New York

There are no vocational training needs which further supervision could afford me, nor are there any medical, housing, or addiction treatment needs left to be addressed. Therefore, this sentencing factor favors early termination.

### §3553(a)(4) – Sentencing Ranges For Supervised Release

I have served more time on supervision than is mandated by §3583(k). Typically, the Sentencing Guidelines Manual recommends one-to-three years for Class C felonies like mine. See 18 U.S.C. §3559(a)(3). The ranges of sentences from Sentencing Commission policy, however, recommends the imposition of the statutory maximum supervision term for any sexual offense: Lifetime. U.S.S.G. §5D1.2(b).

Page 13

These eight years of supervision already served exceeds the mandatory minimum, and nearly triples the maximum term normally used for non-sexual Class C felonies. My time-already-served on supervision is well within the min/max range for my potential sentence (five years to Lifetime). Thus, granting early termination here would not offend the interests of justice. Factor (a)(4) does not weigh against early termination.

## §3553(a)(5) – Applicable Policy

Sentencing Commission on early termination of supervised release is found in U.S.S.G. §5D1.2 App. n.5. Early termination is encouraged if the rehabilitation goals of a Judgment Order have been met, using a substance abuser who completes treatment as an example. Once these recidivism-reducing efforts are complete, this policy encourages the Court to grant early termination.

Policy of the Judicial Conference, developed by the Committee on Criminal Law, recommends early termination when a defendant demonstrates the ability to lawfully self-manage past the expiration of the term of supervision. For defendants who have served more than 18 months of supervision, six criteria are listed. When all six are met, the supervising probation office(r) is presumed to make a recommendation in favor of early termination. See *United States v. Shaw*, 455 F.Supp.3d 1160, 1166 (D. Colo. 2020); see also "Post-Conviction Supervision"; *Guide to Judiciary Policy*, Vol. 8, Pt. E, Ch. 3.[16]

> "For ... early termination after serving 18 or more months of supervised release, 'there is a presumption in favor of recommending early termination for persons who meet the following criteria:'
> (1) The person does not meet the criteria of a career drug offender or career criminal (as described in 28 U.S.C. §994(h)) or has not

---
16 Formerly Monograph 109.

  committed a sex offense or engaged in terrorism;
(2) The person presents no identified risk of harm to the public or victim;
(3) The person is free from any court-reported violations over a 12-month period;
(4) The person demonstrates the ability to lawfully self-manage beyond the period of supervision;
(5) The person is in substantial compliance with all conditions of supervision; and,
(6) The person engaged in appropriate prosocial activities and receives sufficient prosocial support to remain lawful well beyond the period of supervision.
*Id.* §360.20(c)(1)-(6)." *Shaw* at 1163.

I meet five of these six criteria, but the first of these excludes offenders convicted of any sexual offense as eligible for this presumption of a recommendation. Nevertheless, it is clear from these criteria that I am otherwise fully suited for early termination of supervised release. Although this policy may not be binding on the Court, it is "at the very least entitled to respectful consideration." *Hollingsworth v. Perry*, 130 S. Ct. 705 (2010). Both policies either encourage or support granting early termination in my case.

### §3553(a)(6) – Avoiding Sentencing Disparities

The analysis of sentencing disparities in §3583(e) proceedings look at a sentence from two perspectives: comparing both imposed terms and similar cases where early termination has been granted.

According to the Sentencing Commission's Interactive Data Analyzer,[17] 232 defendants were sentenced nationwide between 2015-2021 with U.S.S.G. §2A3.4 used as the primary Guideline. The average term of incarceration in these sentences was 38

---

17 https://ida.ussc.gov.

Page 15

months (median) and 30 months (average). This aligns with the government's sentencing recommendation, asking the Court to sentence me to 33 months of incarceration.

Instead, the sentencing Court departed upward, doubling that term to 65 months. Therefore, my sentence is already disparate from defendants convicted of similar criminal conduct. The same data shows the median term of supervised release imposed in these cases was 60 months (average at 147 months). Unfortunately, this average/median span is truly unhelpful in a disparities analysis.

From the other side of this analysis, similarly situated defendants who had their terms of supervised release terminated early are helpful in avoiding disparities after incarceration is over. For example, see *United States v. Cnockaert*, No. 1:17-CR-033 (W.D. Va. Nov. 20, 2017). There, Defendant Cnockaert was serving an identical 10-year supervision term imposed pursuant to §3583(k) for a child pornography offense. He moved for early termination before, and anticipating, the completion of five years of supervision. This eliminated any problems with friction between §3583(e)(1) and §3583(k), an issue which is still unresolved in most Circuit Courts of Appeals (including the D.C. Circuit). His motion was granted, to take effect on the date Cnockaert had served five years of his supervised release period.

In *United States v. Smith*, No. 18-CR-0408 (D. Colo. Feb. 8, 2022), Defendant James Roy Smith was serving a 15-year term of supervised release for a Transportation in aid of Prostitution (18 U.S.C. §2421). After completing two years of supervision, he applied for early termination, but was denied by Judge Arguello[18] with instructions to try

---

18 Hon. Judge Arguello also authored the *Smith* decision, discussed in the previous section on policy.

Page 16

again in the future. He did so, and his supervision term was ended after 49 months of supervision, nearly a year before the five year mandate from §3583(k) had elapsed.

Bob Seger[19] was a dangerous, repeat sexual offender with two previous Maine convictions for sexually abusing minors. He served an 18-year prison sentence, and another five years in civil commitment custody following its expiration. He was released from civil commitment in 2013 and began his three-year term of supervised release. Defendant Seger submitted an unopposed motion for early termination after serving only 20 months of supervision. That petition was granted by Hon. Judge Woodcock. *United States v. Seger*, No. 1:98-CR-065 (D. Maine Oct. 27, 2014).

These cases are not unique, nor do they all include extraordinary circumstances like serving five unauthorized years in civil commitment custody like Defendant Seger. Granting early termination for terms imposed under §3583(k) is for more common today than it was prior to 2015. For more-recent examples of this practice, see: *United States v. López-Correa,* 164 F.Supp.3d (D.P.R. 2016), *United States v. Kissell*, No. 2:09-CR-196 (W.D. Pa. Jun. 30, 2021), *United States v. LeMasters*, No. 1:07-CR-393 (N.D. Ga. May. 23, 2018) *United States v. Douglass*, No. 1:12-CR-149-1 (N.D. Ga. Jul. 19, 2022), *United States v. Dawson*, No. 1:14-CR-174-1 (D. Wyo. Feb. 17, 2022), *United States v. Scott,* No. 1:11-CR-00171 (D. Id. Nov. 4, 2022), *United States v. Merrill*, No. 1:12-CR-20839 (E.D. Mich. May. 02, 2022), and *United States v. Walker*, No. 3:07-CR-30119 (S.D. Ill. May. 11, 2017).

---

considerations.
19 No relation.

Comparing my case to the eleven examples listed here, it becomes clear that an order granting this motion would not create a sentencing disparity. Whether denying this request *would create* such a disparity is more difficult to answer. Nevertheless, there is no question that §3553(a)(6), at the least, does not weigh against early termination.

### §3553(a)(7) – Restitution Concerns

No restitution ordered in this case and, therefore, this factor weighs neutral in this matter.

## VI. CONCLUSION

For the reasons stated above, the interests of justice are served by granting early termination here. For the reasons stated herein, my conduct warrants early termination in this case. Because the interests of justice and my conduct both support a granting of this motion, I pray this Court agree and discharge me from further supervision.

Signed this 31st, day of March, 2023.

/s/ Andrew Warren
ANDREW WARREN
P.O. Box 180101
Queens, NY 11418
Defendant in *pro se,* Movant

## VII. COMPLIANCE AND COVID-19 *PRO SE* FILING PROCEDURES

This pleading is not written in letter-motion format, as I am the defendant in this case. As such, I am not a practicing attorney in the Southern District of New York and I do not have access to the EM/ECF system for filing. However, this document conforms to L.R.Crim.P. 49.

Insofar as COVID-19 adjusted procedures allow, this motion is filed in "paper copy" pursuant to the "Notice to Pro Se Litigants" filed by this Court on July 7, 2020 via e-mail to Temporary_Pro_Se_Filing@nysd.uscourts.gov. Additionally, I declare that I have signed for – and agree to – receive e-mail notifications under that same notice with the accompanying Consent Form. This Form was filed together with this motion to the temporary *pro se* e-mail address above.

As ECF users, opposing counsel has consented to service by electronic means.